IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs April 11, 2017

**JARROD REESE SPICER v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Obion County**
**No. CC-16-CR-2    Jeffrey W. Parham, Judge**

_____

**No. W2016-02160-CCA-R3-PC**

_____

The petitioner, Jarrod Reese Spicer, appeals the denial of his petition for post-conviction relief, arguing the trial court erred in finding he received effective assistance of counsel. More specifically, the petitioner claims counsel was ineffective because he failed to fully assist the petitioner until receiving full payment for his services, failed to subpoena certain witnesses to testify at trial, failed to obtain a medical expert to rebut the medical examiner's opinion regarding the victim's cause of death, and failed to obtain a mental evaluation. Following our review of the record and submissions of the parties, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which ALAN E. GLENN and TIMOTHY L. EASTER, JJ., joined.

Danny H. Goodman, Jr., Tiptonville, Tennessee, for the appellant, Jarrod Reese Spicer.

Herbert H. Slatery III, Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Tommy A. Thomas, District Attorney General; and James Cannon, Assistant District Attorney General, for the appellee, State of Tennessee.

OPINION

*Facts and Procedural History*

**A.    Trial Proceedings and Direct Appeal**

According to our opinion on direct appeal, the victim, John Thomas Hood, died on March 3, 2008. *State v. Jarrod Reese Spicer*, No. W2014-01817-CCA-R3-CD, 2015 WL 5173969, at *1 (Tenn. Crim. App. Aug. 31, 2015), *perm. app. denied* (Tenn. Jan 14, 2016). That evening, the victim's neighbor stopped by to check on him and found the victim hunched in his kitchen doorway. *Id*. The victim appeared injured, and his body was "'ice cold.'" *Id*. The victim's home had been ransacked, and medications belonging to the petitioner's mother, who lived with the victim, were missing. *Id*. at *1-2. Additionally, "'old silver half-dollars and dimes'" that also belonged to the petitioner's mother were missing. *Id*. at *6.

The neighbor called 911, and the victim was eventually pronounced dead. *Id*. at *3. Dr. Marco Ross performed an autopsy and "'found evidence of strangulation that consisted of some abrasions or scrape marks on the front of the neck, as well as a fracture of part of the thyroid cartilages[.]'" *Id*. According to Dr. Ross, "fractured thyroid cartilage is a 'serious bodily injury' that is primarily associated with strangulations and hangings and is caused by 'a fair amount of force in order to break that cartilage.'" *Id*. Dr. Ross also found heart disease, severe intestinal necrosis, and abnormalities in the victim's kidneys and liver. *Id*. Dr. Ross could not give a definitive cause of the victim's death. *Id*. Intestinal necrosis alone could have been the primary cause of death, but strangulation also could have triggered enough stress on the victim's heart and brain to cause his death. *Id*.

Sometime in March of 2008, the petitioner asked Breanna Weaver to meet him at a motel in Haiti, Missouri. *Id*. at *5. Ms. Weaver testified that she saw hydrocodone and two guns on a table inside the motel room. *Id*. Ms. Weaver had sex with the petitioner in exchange for crack cocaine, and the two smoked the crack cocaine together. *Id*. The petitioner then confessed to accidentally killing the victim. *Id*. The petitioner told Ms. Weaver that he went to the victim's house "'to see if he could get his pills, and they got to fighting [be]cause he wouldn't give them to him, so that's when he choked him.'" *Id*.

While incarcerated on an unrelated matter, the petitioner again confessed to accidentally killing the victim. *Id*. at *4. The petitioner told another inmate that he and the victim got into an altercation, and the victim pulled out a .38 caliber handgun. *Id*. The petitioner knocked the handgun from the victim's hand, and the dispute ended with the petitioner's "'grabbing [the victim] by the neck and sliding him down the refrigerator' so that [the victim] 'was sitting like a frog or something.'" *Id*. The petitioner also admitted to the inmate that he took hydrocodone pills, a .45 caliber pistol, and the .38 caliber pistol from the victim's home and threw the .38 caliber pistol into the Mississippi River. *Id*.

- 2 -

On at least two occasions, the petitioner also informed Toby Hicks, the petitioner's brother-in-law, that he accidentally killed the victim. *Id*. at *6-7. He first confessed about a month after the victim's death while at a "'strip joint'" in Poplar Bluff, Missouri. *Id*. at *6. The petitioner told Mr. Hicks that he accidentally killed the victim because "'he was mad about [the victim] getting all his mother's possessions.'" *Id*. At the time the petitioner made this confession to Mr. Hicks, he was under the influence of methamphetamine, methadone, hydrocodone, Xanax, valium, and alcohol. *Id*.

In May of 2013, the petitioner again told Mr. Hicks he killed the victim. *Id*. Mr. Hicks was with the petitioner and his brother, and they were "'real bad doped up on meth.'" *Id*. According to Mr. Hicks, the petitioner said that "'he wasn't going to see [the victim] get any of [his] mom's stuff. [The petitioner] said it belonged to [him]. [The petitioner] said it was an accident but that he killed [the victim].'" *Id*. At trial, Mr. Hicks testified that the petitioner told him "'he hit [the petitioner] one time but he thought he knocked him out.'" *Id*.

After the State rested, the petitioner called two witnesses to testify. *Id*. at *7. JoNelle Spicer, who was married to the petitioner at the time of the victim's death, testified that on the afternoon of March 3, 2008, she and the petitioner left their home in Haiti, Missouri and began driving to Troy, Tennessee to visit the petitioner's mother. *Id*. It began to rain heavily, so she and the petitioner eventually returned home. *Id*. The petitioner left the house for approximately twenty minutes that evening and then left again around midnight. *Id*. Ms. Spicer did not see the petitioner again until 9:30 p.m. or 10:00 p.m. the following night. *Id*. This testimony was significantly different than a statement Ms. Spicer previously gave to law enforcement, but at trial Ms. Spicer testified that her prior statement was incorrect due to a misunderstanding. *Id*.

Additionally, the petitioner's current wife, Amanda Spicer, testified at trial. *Id*. Mrs. Spicer testified that the petitioner "hustles," and frequently traded guns or hydrocodone pills. *Id*. He additionally received a disability check. *Id*.

The jury found the petitioner guilty of voluntary manslaughter, second degree murder, aggravated robbery, and theft. *Id*. The trial court merged the voluntary manslaughter conviction into the second degree murder conviction and merged the theft conviction into the aggravated robbery conviction. *Id*. Following a sentencing hearing, the trial court imposed concurrent sentences of twenty-five years for the murder conviction and twelve years for the aggravated robbery conviction. *Id*.

Following the denial of his motion for new trial, a timely direct appeal followed. *Id*. The petitioner challenged the sufficiency of the evidence and the trial court's imposition of the maximum sentence for each conviction. *Id*. at *8. Noting "[t]he jury is

entitled to determine the credibility of all the witnesses and evaluate all of the evidence," this Court concluded the petitioner was not entitled to relief on the basis of insufficient evidence to support his convictions. *Id*. at *9. This Court further found no evidence that the trial court abused its discretion when imposing the effective thirty-seven year sentence. *Id*. at *11. Our Supreme Court denied the petitioner's application for permission to appeal. *Id*. at *1.

## B. Post-Conviction Proceedings

After the conclusion of his direct appeal, the petitioner filed a timely pro se petition for post-conviction relief. The post-conviction court appointed counsel to represent the petitioner, and the petitioner filed an amended petition, arguing: trial counsel failed to properly investigate the facts of the case prior to trial; trial counsel failed to retain and call a medical expert at trial to rebut the expert testimony presented by the State regarding the cause of the victim's death; trial counsel refused to present the witnesses that were subpoenaed to testify on the petitioner's behalf at trial despite their availability to testify; trial counsel did not present any evidence regarding the .45 caliber handgun that was allegedly stolen from the victim; trial counsel did not challenge the handwriting in confession letters allegedly sent by the petitioner; and trial counsel failed to request a psychological examination for the petitioner.

The post-conviction court subsequently held a hearing where the petitioner called himself, potential witness Rhonda Hicks, and trial counsel to testify. The petitioner testified he hired trial counsel to represent him in the underlying matter but could not pay his full retainer. His sister tried to help pay the legal fees but could not pay the entire bill. According to the petitioner, trial counsel told him he could not continue to represent him without being paid in full. The petitioner, therefore, wanted to plead guilty, but alleged trial counsel would not allow him to do so.

According to the petitioner, he was never satisfied that the medical examiner found the cause of death to be "undetermined." He asked trial counsel to obtain an expert to counter Dr. Ross' opinions as to cause of death. In response, trial counsel told him, "It takes money to do all that, and you haven't paid me."

The petitioner testified that he denied writing the confession letters introduced by the State. He told trial counsel he wanted to contest the handwriting, and trial counsel said that would take money. This frustrated the petitioner because the letters put him at the scene of the murder, and he felt the trial judge used the letters to impose the maximum sentence.

In 2008 and at the time of trial, the petitioner was on medication due to a head injury. According to the petitioner, the medication made him slow. The petitioner felt trial counsel should have obtained a mental evaluation to ascertain the petitioner's competency at the time of the victim's death and at the time of trial, but he did not.

The petitioner further alleges trial counsel failed to adequately investigate his case prior to trial. After the medical examiner found the victim's cause of death to be undetermined, the petitioner asked for a second opinion. In addition, the petitioner testified he requested trial counsel speak with potential witnesses George Cook, David Case, Brandi Darnell, Chandell Wallace, Mr. Woods, and Agent Ryan with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). These potential witnesses were noticeably absent from the post-conviction hearing.

The petitioner further testified that trial counsel should have called his sister, Rhonda Hicks, as a witness. At the post-conviction hearing, Mrs. Hicks testified that had she been called as a witness at trial, she would have testified that the day after the victim's murder, she and her husband, Toby Hicks, went to the petitioner's house. Steve Pollock arrived at the same time. When Mr. Pollock got out of his car, he had a long gun in one hand and a longer pistol in a green case in his other hand. The petitioner was standing on the porch, and Steve Pollock walked toward him. Mrs. Hicks and her husband left because they thought the petitioner had business with Steve Pollock that needed to be discussed. When Mrs. Hicks returned later that day, the petitioner informed her that Steve Pollock tried to leave the guns at his house. This angered the petitioner's wife because she was afraid they were stolen. A couple days later, Mrs. Hicks and her husband rode with the petitioner to meet Steve Pollock and his father, Mike Pollock. Mike Pollock handed the petitioner $500 in cash and told him to keep his mouth shut about his son being at the victim's house. The petitioner was on crack cocaine at the time and did not have any money, so he took the cash.

Mrs. Hicks further testified that she hired trial counsel to represent the petitioner but only partially paid him. She had not paid trial counsel in full prior to trial because she did not have enough money. Prior to trial, Mrs. Hicks spoke with trial counsel over the phone regarding her potential testimony. She then appeared at the trial ready to testify, but trial counsel never called her as a witness.

According to Mrs. Hicks, her husband, Toby Hicks, was called as a witness at trial and should not have been. Prior to testifying, he took a handful of Xanax and said he could not remember anything. The trial judge then ordered Mr. Hicks to be taken to the jail during the noon recess and brought back when court resumed at 1:00 p.m. Mr. Hicks told Mrs. Hicks that while at the jail, "one of them got in his face and slammed his hand down on the table and told him that if he didn't come back over here and testify to the

fact that [the petitioner] told him that he killed [the victim], that they were going to lock him up for each felony that he had ever had." Afterwards, Mr. Hicks came back to the courthouse and testified against the petitioner.

Trial counsel testified next and confirmed he represented the petitioner during the jury trial and sentencing hearing. He was retained, not appointed, and never received full payment. However, the petitioner's failure to fully pay him did not impact his trial preparations.

Prior to trial, the petitioner's brother, Jason Spicer, gave a statement to the police indicating the petitioner confessed to the murder. For this reason, trial counsel was of the opinion that it was in the petitioner's best interest not to call Jason Spicer as a witness. He did not remember speaking with Jason Spicer when preparing for trial.

Trial counsel testified that he spoke with Mrs. Hicks several times prior to trial. He met at McDonald's with Mrs. Hicks, Mr. Hicks, Amanda Spicer, and David Case. At some point they decided not to call Mrs. Hicks as a witness, but he no longer remembered why this decision was made. While he could not remember what Mr. Case told him about the matter, counsel did recall the statement Mr. Case gave to the police and thought it would be in the petitioner's best interest not to call him as a witness at trial. He does not remember Mr. Case serving as an alibi for the petitioner's whereabouts at the time of the victim's death.

Trial counsel never spoke with the petitioner about undergoing a psychological exam. According to trial counsel, the petitioner seemed perfectly lucid when they spoke. Trial counsel did not know that at the time of the murder and over the course of representation that the petitioner was taking Dilantin, Hydrocodone, Neurontin, and Zoloft. The petitioner never told trial counsel he suffered a brain injury in 1999. However, had he known these things, he would still not have requested a psychological examination. Trial counsel saw no apparent need for one and noted the petitioner understood everything trial counsel told him and provided logical responses to questions.

According to trial counsel, the State called Dr. Marco Ross, the medical examiner who performed the victim's autopsy, to testify at trial. Dr. Ross could not give a definitive cause of death but did say he could not rule out strangulation. He found a fracture to the cartilage in the front part of the victim's neck or throat area that could have been the cause of death, but Dr. Ross also felt the victim could have suffered heart failure or other complications. Trial counsel testified he had the report prior to trial but did not seek an expert. The petitioner did not have enough money to retain an expert. He did not ask the court for money to hire an expert because he did not know whether, as a retained

lawyer, that could be done. According to trial counsel, if he had it to do over again, he would have asked the court for the money.

Trial counsel testified that he communicated a plea offer of eight years at thirty percent to the petitioner. Trial counsel thought the petitioner should accept it, but he turned it down. He never informed the petitioner that he could not accept the plea offer without paying the outstanding legal fees first.

According to trial counsel, he did not pursue the theory the Pollocks were involved in the victim's death because he did not have any proof to support that defense. Had there been even a scintilla of evidence other than statements from the petitioner, he would have pursued it. Based on the information he had, calling the Pollocks to testify at trial would not have helped the petitioner.

The post-conviction court subsequently entered a written order denying the petition for post-conviction relief, finding, "After reviewing the evidence in this case, including the trial transcript, and testimony at this hearing, along with [e]xhibits entered, the Court concludes that the evidence fails to establish by a clear and convincing standard that Petitioner received ineffective assistance of counsel." Accordingly, the post-conviction court denied the petitioner's claim for post-conviction relief and reappointed post-conviction counsel to represent the petitioner for the purpose of appeal. This timely appeal followed.

*Analysis*

On appeal, the petitioner argues trial counsel provided ineffective assistance by refusing to fully assist him until receiving full payment for his services, failing to subpoena certain witnesses to testify at trial, failing to obtain a medical expert to rebut the medical examiner's opinion regarding the victim's cause of death, and failing to obtain a mental evaluation of the petitioner. The State contends the petitioner has failed to show how trial counsel's performance was deficient or how he was prejudiced by the alleged deficiencies. We agree with the State and affirm the judgment of the post-conviction court.

To obtain relief in a post-conviction proceeding, a petitioner must demonstrate that his or her "conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. The post-conviction petitioner bears the burden of proving his allegations of fact by clear and convincing evidence. *See* Tenn. Code Ann. § 40-30-110(f). "'Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'"

*Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010) (quoting *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009)).

Appellate courts do not reassess the trial court's determination of the credibility of witnesses. *Dellinger v. State*, 279 S.W.3d 282, 292 (Tenn. 2009) (citing *R.D.S. v. State*, 245 S.W.3d 356, 362 (Tenn. 2008)). Assessing the credibility of witnesses is a matter "'entrusted to the trial judge as the trier of fact.'" *R.D.S.*, 245 S.W.3d at 362 (quoting *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. *See Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. *See Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is de novo, with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed de novo, with a presumption of correctness given only to the post-conviction court's findings of fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001); *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

The Sixth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, and article I, section 9 of the Tennessee Constitution both require that criminal defendants receive effective assistance of counsel. *Cauthern v. State*, 145 S.W.3d 571, 598 (Tenn. Crim. App. 2004) (citation omitted). When a petitioner claims he received ineffective assistance of counsel, he has the burden of showing trial counsel's performance was deficient and this deficient performance prejudiced the outcome of the proceeding. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel applied in federal cases also applies in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). With regard to the standard, our Supreme Court has held:

> [T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence . . . Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations.

*Finch v. State*, 226 S.W.3d 307, 315-16 (Tenn. 2007) (quoting *Baxter*, 523 S.W.2d at 934-35).

When reviewing trial counsel's performance, this Court "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." *Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 689). The fact a trial strategy or tactic failed or was detrimental to the defense does not, alone, support a claim for ineffective assistance of counsel. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is given to sound tactical decisions made after adequate preparation for the case. *Id.*

To satisfy the prejudice prong of the test, the petitioner "must establish a reasonable probability that but for counsel's errors the result of the proceeding would have been different." *Vaughn v. State*, 202 S.W.3d 106, 116 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 694). "A 'reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Strickland*, 466 U.S. at 694). In order for the petitioner to prevail, the deficient performance must have been of such magnitude that the petitioner was deprived of a fair trial and the reliability of the outcome was called into question. *Finch*, 226 S.W.3d at 316.

Courts need not approach the *Strickland* test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; *see also Goad,* 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

When a petitioner contends trial counsel failed to discover, interview, or present witnesses in support of his defense, the petitioner must call those witnesses to testify at an evidentiary hearing. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). This is the only way the petitioner can establish:

> that (a) a material witness existed and the witness could have been discovered but for counsel's neglect in his investigation of the case, (b) a known witness was not interviewed, (c) the failure to discover or interview a witness injured to his prejudice, or (d) the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner.

*Id*.

Here, the petitioner argues trial counsel quit rendering effective assistance due to his failure to pay the full retainer and references several alleged shortcomings, including trial counsel's failure to meet with and call certain witnesses at trial, failure to obtain an expert medical examiner, and failure to obtain a mental evaluation. When testifying at the post-conviction hearing, the petitioner referenced seven witnesses he requested trial counsel subpoena and further opined trial counsel should have retained a medical expert to render an opinion regarding the victim's cause of death. Of these potential witnesses, only Mrs. Hicks testified at the post-conviction hearing regarding what she would have said if called as a witness. Neither the post-conviction court nor this Court can speculate as to what potential fact or expert witnesses would have said and how this testimony would have benefitted the petitioner. *See Brimmer v. State*, 29 S.W.3d 497, 512 (Tenn. Crim. App. 1998). The petitioner has not shown he was prejudiced by trial counsel's failure to speak with and subpoena George Cook, David Case, Brandi Darnell, Chandell Wallace, Mr. Woods, and Agent Ryan, nor has he shown he was prejudiced by trial counsel's failure to retain and call a medical causation expert to testify at trial. The petitioner is not entitled to post-conviction relief on these issues.

With respect to Mrs. Hicks, trial counsel testified that he decided it was in the petitioner's best interest not to call her as a witness at trial but could not remember why he felt that way. Mrs. Hicks testified that had she been called as a witness, she would have provided an alternative theory that the Pollocks were responsible for the victim's death. According to trial counsel, he did not present this theory at trial because there was no evidence to support it. This was a tactical decision made by trial counsel after adequate trial preparation, and we give deference to it. The petitioner is not entitled to relief on this issue.

Lastly, the petitioner maintains trial counsel should have requested a psychiatric evaluation to determine his mental capacity at the time of the murder and at the time of trial. The record, however, is void of evidence as to what an expert would have said and how it would have aided in his defense. Again, claims of ineffective assistance of counsel based on a failure to present evidence requires proof of what the evidence would have been and how it would have aided in the petitioner's defense. *Id*. Without this evidence, post-conviction relief is not warranted because the petitioner has not shown prejudice. *See William Darryn Busby v. State*, No. M2012-00709-CCA-R3-PC, 2013 WL 5873276, at *14 (Tenn. Crim. App. Oct. 30, 2013), *perm. app. denied* (Tenn. Mar. 5, 2014). Moreover, trial counsel testified that when interacting with the petitioner, he was able to have a coherent conversation. The petitioner logically responded to trial counsel's questions and appeared to understand everything trial counsel told him. The post-conviction court accredited trial counsel's testimony when denying the petitioner's request for post-conviction relief, and we cannot reevaluate this testimony on appeal. The petitioner is not entitled to relief on this issue.

## *Conclusion*

Based on the foregoing authorities and reasoning, the judgment of the post-conviction court is affirmed.

_____
J. ROSS DYER, JUDGE